UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATRINA WOODALL, KATANA
JOHNSTON, KELLY DAVIS, and
LATOYA HEARST,

      Plaintiffs,

v.

WAYNE COUNTY, et al.,

      Defendants.

Case No. 17-13707
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AGAINST WOODALL, JOHNSTON, DAVIS, AND HEARST [89, 90, 91, 92]

---

Four women—Katrina Woodall, Katana Johnston, Kelly Davis, and Latoya Hearst—were all incarcerated at the Wayne County Jail at various points in 2013 and 2014. They say they were strip-searched by Jail officers in humiliating ways. Specifically, they say that Officer Teri Graham, who works the registry at the Jail, strip-searched them in groups of five or more, made derogatory comments about their bodies, allowed men to see them being strip-searched, and maintained an unsanitary environment. Apart from the registry, Plaintiffs also say they were strip searched in the housing unit in front of male officers. And because many women—at least 99—claim they were subject to similar strip searches, Plaintiffs accuse Wayne County, the

municipality in charge of the Jail, of ignoring a pattern of constitutional violations and failing to train its officers or otherwise address the issue, allowing the violations to continue.

After a lengthy procedural history, Defendants' motions for summary judgment against each Plaintiff are before this Court. (ECF Nos. 89, 90, 91, 92.) Because Plaintiffs' claims against Graham that arose in 2013 are barred by the statute of limitations, those claims are dismissed. But plaintiffs have shown a reasonable jury could find for them as to their *Monell* claim against Wayne County for the 2013 searches, so those claims survive. One plaintiff, Hearst, also has claims for searches that occurred in January 2014. Hearst's claim against Graham that arose in January 2014 survives, but her *Monell* claim based on her January 2014 strip searches is dismissed.

## I.

### A. Facts

All four plaintiffs say that they were subject to unconstitutional strip searches at Wayne County Jail, but the details of these searches vary slightly for each plaintiff.

Katrina Woodall was detained at the Jail multiple times in 2013, the last date being July 9, 2013. (*See* ECF No. 89-6, PageID.2386, 2396.) She states that Corporal Terri Graham, who works at registry, strip searched her in a group of eight to 12 women. (*Id.* at PageID.2396.) Woodall claims that the

officers, including Graham, intentionally waited for the "bullpen," (i.e. the cell where detainees would wait before being registered into the Jail) to get full before taking everyone upstairs and that "they was lazy to do them one by one." (*Id.* at PageID.2387.) Woodall also testified that Graham called her names like "bleeding hog" and "stanky." (*Id.* at PageID.2397.) She also complained of being strip-searched in front of other women while she was menstruating. (*Id.* at PageID.2383.) Woodall described one incident where a male officer saw her being strip searched through a window in the strip search room and commented on the underwear she had on. (*Id.* at PageID.2415.)

Katana Johnston[1] arrived at the Jail on June 17, 2013 and left on August 8, 2013. (ECF No. 92-4, PageID.3069–3070.) Johnston states that she could see male trustees (incarcerated people who perform cleaning and other services for the Jail) through the window while being strip searched at registry. (*Id.* at PageID.3070, 3073.) She complains that she was also strip searched while she was on her period and forced to bleed on herself during the search because Graham did not give her a pad. (*Id.*) Johnston asked Graham for another pad after the search, but Graham said she would only receive one upstairs. (*Id.* at PageID.3071.) Johnston testified that Graham said that "we stank," and called

---

[1] In some places in the record, Katana Johnston is listed as Katana Johnson. But in her deposition and declaration, she says her name is Katana Johnston. (*See* ECF No. 18-8, PageID.1156; ECF No. 92-4, PageID.3062.) So the Court will use Johnston to identify this plaintiff.

the detainees "funky bitches." (*Id.*) Graham also called Johnston a "dope fiend" because she had marks on her arm. (*Id.* at PageID.3072.) Johnston also claims that she was strip searched in a group of five women. (*Id.* at PageID.3073.)

Kelly Davis was admitted into the Jail on February 26, 2013 and left on June 14, 2013. (ECF No. 90-6, PageID.2638.) During her registry strip search, Davis says that Graham searched her in front of other female detainees or in view of men who were on the other side of a window looking into the room where she was searched. (*Id.* at PageID.2649.) She specifically remembers a male officer coming into the adjacent room that has a window looking into the strip-search room and asking Graham if she has any candy for sale (Graham had a side-business selling snacks to Jail personnel). (*Id.* at PageID2647.) Davis testified that Graham made "smart remarks" during these searches, including saying that Davis was never pregnant despite knowing that she had suffered a miscarriage. (*Id.* at PageID.2646.) Davis also describes an incident when she was being taken back to the housing unit by a female officer and the officer groped her breasts and vagina. (*Id.* at PageID.2641.)

Latoya Hearst was detained at the Jail in July 2013 and from January 7, 2014 through January 10, 2014. (ECF No. 91-6, PageID.2856.) She testified that Graham "used to wait until the bullpen was full of us, like five, six, maybe seven of us, bring us all in, have us all strip search[ed]." (*Id.* at PageID.2859.) She also stated that Graham would say "she don't want to smell our nasty

funky pussies. She don't want to smell our nasty asses." (*Id.*) Hearst testified that she could hear men outside the registry during these searches but does not allege that they saw her being strip-searched at registry. (*Id.* at PageID.2863, 2866.) She also remembers that in 2013, there was a "shakedown" of the housing unit, and she was strip searched in view of a male sergeant, who was intentionally looking at the women being searched, and two male officers. (*Id.* at PageID.2859.)

In addition to the four plaintiffs' testimony, Plaintiffs have submitted a number of declarations from other detainees recounting their similar experiences with strip searches at the Jail. (*See generally* ECF Nos. 18-2, 18-3, 18-4, 18-5.) Many of these declarations do not specify the dates for which the declarant was detained or the dates the strip searches took place. For those declarations that do specify dates of incarceration, they range from the 1990s to 2016. (*Id.*)

Graham denies all of the accusations against her. (*See, e.g.*, ECF No. 90-11, PageID.2732.) Before November 2013, the Jail's policy was to conduct strip searches out of the view of the public and other detainees "when possible." (ECF No. 102-3, PageID.3345.) Graham states that during this time, she would take up to five detainees to be strip searched, depending on how many women were waiting to be registered. (ECF No. 90-11, PageID.2714.) But the Jail changed its strip-search policy on November 22, 2013, mandating that all strip

5

searches of female detainees be conducted one at a time, and not in a group. (ECF No. 102-2, PageID.3341.) Since that date, says Graham, she has only conducted strip searches one by one. (ECF No. 90-11, PageID.2726.)

Graham also denies making any derogatory comments to any detainee while processing them into the Jail (*id.* at PageID.2725), which is in line with the County's policy to avoid making derogatory comments (ECF No. 102-3, PageID.3345).

And regarding Plaintiffs' testimony that they were searched at registry in view of male officers and trustees, Graham states that no men were allowed in the change-out room, which is where Plaintiffs allege they saw men through the window. (ECF No. 90-11, PageID.2720, 2723.) The Jail's policy specifically states that a strip search "is to be conducted by an officer of the same gender as the inmate being searched and out of view of persons of the opposite gender." (ECF No. 102-3, PageID.3345.)

As far as training goes, Graham testified that she did not take any classes on how to conduct a strip search. (ECF No. 90-11, PageID.2720.) Instead, she received an explanation on how to conduct strip searches from the officers at the registry when she first started. (*Id.*) Graham also testified that she last read the strip search policy when it was changed in November 2013. (*Id.* at PageID.2725.)

## B. Procedural History

In 2017, a few years after the alleged violations took place, Plaintiffs filed a complaint against Wayne County, Wayne County Sheriff Benny Napoleon in his official capacity, and Graham in her individual capacity. (ECF No. 1.) The case was assigned to District Judge Arthur J. Tarnow. In the complaint, Plaintiffs allege under 42 U.S.C. § 1983 that Graham violated the Fourth Amendment's prohibition on unreasonable searches and that the County and Sheriff are also liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

In response, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(5) and 12(b)(6). (ECF No. 10.) The Court granted the motion in part, dismissing two of the plaintiffs based on the statute-of-limitations and holding that it lacks jurisdiction over plaintiffs' claim for injunctive relief for lack of standing. (ECF No. 31, PageID.1390, 1396.) But the Court rejected Defendants' arguments on qualified immunity, inadequate pleading of the *Monell* claim, and improper service. (*Id.* at PageID.1398–1399, 1401.)

Later in the litigation, Plaintiffs filed a renewed motion for class certification. (ECF No. 51.) The Court granted this motion. (ECF No. 81.) Defendants appealed.

Meanwhile, Defendants filed a separate motion for summary judgment against each plaintiff. (ECF Nos. 89 (Woodall), 90 (Davis), 91 (Hearst), 92 (Johnston).) Before these motions could be decided, the Court stayed the case pending the interlocutory appeal on class certification. (ECF No. 111.)

About 11 months after the case was stayed, the Sixth Circuit issued an opinion reversing the Court's grant of class certification. (ECF No. 112.) Judge Tarnow then reinstated all four motions for summary judgment. (ECF No. 114.) He also allowed supplemental briefs, which each party filed. (ECF Nos. 120, 121.) Plaintiffs indicated they would like to proceed despite not being able to represent a class. (ECF No. 121, PageID.3589.)

Less than two months after the motions for summary judgment were reinstated, this case was reassigned to the undersigned. The four motions are now before the Court. The parties have provided adequate briefing that enables resolution of the motions without the need for further argument. *See* E.D. Mich. LR 7.1(f).

## II.

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Summary judgment

requires the court to view all evidence in the light most favorable to the nonmoving

party and is appropriate only if that party cannot show sufficient evidence to create a genuine issue of material fact. *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017).

## III.

The Court begins with the plaintiffs' claims against Graham. Graham raises two arguments for summary judgment of these claims. One, Graham argues that the statute of limitations bars Plaintiffs' claims that arose in 2013. And two, Graham states that qualified immunity shields her from liability for her conduct toward Hearst in January 2014.

### A. Statute of Limitations

The statute-of-limitations issue boils down to whether, in a related case, an amended complaint relates back to the original complaint. But before it can get to that key issue, the Court must address Plaintiffs' threshold argument. Plaintiffs say that it is improper for Graham to re-raise statute-of-limitations arguments in her motions for summary judgment because the issue was already considered by the Court at the motion-to-dismiss stage.

Although Judge Tarnow previously held that the current plaintiffs' claims fell within the statute of limitations (ECF No. 31), that does not prevent Graham from re-raising this defense at summary judgment. Because the statute of limitations is an affirmative defense, "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim" on this basis. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). It is only when the allegations in a complaint "affirmatively show" that a claim is time-barred that it is appropriate for a Court to dismiss the claim under Rule 12(b)(6). *Id.* The complaint here did not allege any specific dates the Plaintiffs were housed in Wayne County Jail, so Judge Tarnow had limited information upon which he could consider Graham's arguments. (*See* ECF No. 1, PageID.4.) Having now had the benefit of discovery and a chance to further investigate and develop the relevant facts, Graham may once again present her statute-of-limitations defense to this Court.

With that issue resolved, the Court can return to the primary issue of relation-back. Both parties agree that the relevant statute of limitations for the claims against Graham is three years. *See Crabbs v. Scott*, 880 F.3d 292, 294–95 (6th Cir. 2018); Mich. Comp. Laws § 600.5805(8). This case was filed on November 14, 2017. (*See* ECF No. 1.) Neither party has presented the Court with exact dates of when the strip searches occurred. But, since it does not

affect the outcome, the Court will assume in Plaintiffs' favor that the claims accrued on the last date in 2013 any of them were at Wayne County Jail. That date was August 8, 2013. (*See* ECF No. 89-6, PageID.2396; ECF No. 90-6, PageID.2638; ECF No. 91-6, PageID.2856; ECF No. 92-4, PageID.3064.) So, if this were the only consideration, the statute of limitations on these claims would have expired on August 8, 2016, at the latest, and this case would be time barred because it was not filed until 2017.

But things are a bit more complicated. As established in the motion-to-dismiss opinion, Plaintiffs' claims against Graham are subject to tolling based on the Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and its progeny. *American Pipe* holds that the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue to a class action." *Id.* at 552. This form of equitable tolling, the Court reasoned, was in line with the purposes of Federal Rule of Civil Procedure 23, which seeks to limit motions and cases filed before the court "where a class action is found superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* at 551.

So the question becomes how long these claims were tolled for under *American Pipe*. In this case, the prior class action that tolls the statute of limitations for Plaintiffs' claims against Graham is *Weathington v. City of*

11

*Detroit, et al.*, Case No. 5:12-cv-13573 (E.D. Mich. 2012) (O'Meara, J.). There, Janine Weathington brought claims against the Wayne County Jail, Wayne County Sheriff, and other individuals for strip searches conducted at the Jail; the claims were almost identical to the claims brought here. *See* Complaint, *Weathington*, Case No. 5:12-cv-13573, ECF No. 1. Although *Weathington* was originally filed on September 10, 2012, Judge Tarnow previously found that the original complaint did not purport to be a class action (and it was filed before these three claims accrued, so neither party would be on notice that the complaint intended to include these three claims). (*See* ECF No. 31, PageID.1390.) So Judge Tarnow held that Plaintiffs' claims were instead tolled starting on October 16, 2013, which is when Weathington filed for class certification. (*Id.*) Weathington's class certification motion states that the class includes "current, past, and future female inmates incarcerated within The Wayne County Jail[,]" which would include all four plaintiffs' claims from the summer of 2013. Mot. for Certification as a Class, *Weathington*, Case No. 5:12-cv-13573, ECF No. 30, PageID.84. The parties do not dispute that, following Judge Tarnow's reasoning, the proper date of when *Weathington*, as originally filed, commenced as a class action is October 16, 2013.

The parties do dispute, however, whether October 16, 2013 is the date tolling commences for the statute of limitations for claims against Graham. Graham argues that the statute of limitations for claims against her should

12

instead be tolled starting on May 9, 2014, which is when she was added as a defendant in *Weathington*. *See* Amended Compl. and Jury Demand, 5:12-cv-13573, ECF No. 53. Before that date, says Graham, *American Pipe* tolling should not apply because the class action did not include claims against Graham, so Plaintiffs would have no reason to think those particular claims would be litigated in *Weathington* and that they need not act on them. In other words, according to Graham, the statute of limitations for Plaintiffs' claims against Graham ran at least from August 8, 2013 to May 9, 2014 (the last date the plaintiffs were at the Jail in 2013 until the date Graham was named in *Weathington*) and then from August 3, 2015 to November 14, 2017 (the date *Weathington* was dismissed until the date this suit was filed), which, added together, puts them beyond the three-year statute of limitations.

Plaintiffs argue that this Court should follow Judge Tarnow's previous holding that, though Graham was not added to the *Weathington* suit until May 2014, the amended complaint adding her as a defendant relates back to the original 2012 complaint under Federal Rule of Civil Procedure 15(c)(1)(C). (*See* ECF No. 31.) Thus, the statute of limitations for the claims against Graham should be tolled starting on the same date as the claims in the original complaint—October 16, 2013. In his analysis, Judge Tarnow found, "Officer Graham would have had notice of the suit, however, as several of her coworkers were named, and she was not prejudiced by the late addition, as Wayne County

Corporation Counsel continued to defend the suit. . . . There is no difference between the statute of limitations as applied to the municipal defendants and as applied to the individual defendant." (ECF No. 31, PageID.1390.)

When considering whether the May 9, 2014 amended complaint relates back to the original 2012 complaint in *Weathington*, the Court finds that the requirements under Federal Rule of Civil Procedure 15(c)(1)(C) have not been met. In relevant part, the Rule states that, "An amendment to a pleading relates back to the date of the original pleading when the amendment changes the party or the naming of the party against whom a claim is asserted . . . if, . . . the party to be brought in by amendment . . . (ii) knew or should have known that the action would have been brought against it, *but for a mistake concerning the proper party's identity.*"

There is no evidence that Graham knew or should have known that she would have originally been sued in *Weathington* "but for a mistake concerning the proper party's identity." *See* Fed. R. Civ. P. 15(c)(1)(C). Plaintiffs offer no argument or evidence on this point in either their response to the motion for summary judgment (ECF No. 102) or in their response to the motion to dismiss (ECF No. 14). The amended complaint in *Weathington* does not state why Graham was being added as a party. And the reasoning in the prior opinion addressed whether Graham was prejudiced by her later addition as a defendant and whether she would have had notice—but it does not discuss

14

whether the omission of Graham as a defendant was due to a mistake. (*See* ECF No. 31, PageID.1390.)

Although Plaintiffs' failure to offer evidence of mistake is dispositive, the Court notes that there is evidence that Graham's omission from the original complaint was not a mistake. A motion to add Graham to *Weathington* that was terminated before being decided states that Graham was added after counsel reviewed the record and "identified a female correctional officer Ms. Graham as one of the perpetrators of these unconstitutional strip searches" and that Weathington was not aware "of the identity of proposed Defendant Graham[.]" Pl.'s Mot. to Amend Compl. and to Add a Party, Case No. 5:12-cv-13573, ECF No. 44, PageID.322–323.

Neither of these reasons constitutes a "mistake" under Rule 15(c)(1)(C). The first reason suggests that counsel discovered a claim against Graham after the initial complaint was filed, which is not a mistake concerning the property party's identity—it is the discovery of another potentially culpable party. And later discovering the identity of a defendant that was not originally known has routinely been held by the Sixth Circuit as not being covered by the mistaken identity provisions of Rule 15(c)(1)(C). *See Brown v. Cuyahoga Cnty, Ohio*, 517 F. App'x 431, 433 (6th Cir. 2013) ("[T]he litigants focus their dispute on whether Brown's lack of knowledge of the identities of jail employees constitutes a 'mistake.' We have previously held that an absence of knowledge

is not a mistake, as required by Rule 15(c)(1)(C)(ii)." (citing *Cox v. Treadway*, 75 F.3d 230, 234 (6th Cir. 1996))). The Court has not identified any other argument in support of finding that the omission of Graham from the original complaint was made due to a mistake concerning the proper party's identity. Thus, the May 9, 2014 amended complaint in *Weathington* adding Graham as a party does not relate back to the original filing date under Federal Rule of Civil Procedure 15(c).

It therefore follows that the statute of limitations for claims against Graham was not tolled until May 9, 2014. And, as explained previously, that would mean the statute of limitations for Plaintiffs' claims from 2013 against Graham ran (at least) from August 8, 2013 to May 9, 2014, or 9 months and 1 day.

This almost dispenses with the statute-of-limitations issue. But there is one more question for the Court to decide: when tolling for the *Weathington* class action ended. The *Weathington* class certification motion was administratively terminated on July 31, 2014. As this was not a decision on the merits of the motion, but instead a function of the Court's management of the case, this date does not conclude the tolling period. *See Potter v. Comm'r of Social Security*, 9 F.4th 369, 378 (6th Cir. 2021) (finding that an administrative stay of a class certification motion does not terminate the *American Pipe* tolling

period because "it expressed no opinion on the merits of the claims against the SSA or whether the suit [was] inappropriate for class action status").

After the class certification motion was stayed, the *Weathington* Court never decided it on the merits. Instead, *Weathington* was dismissed on August 3, 2015. Order Dismissing Case, Case No. 5:12-cv-13573, ECF No. 102. In the motion-to-dismiss opinion, Judge Tarnow stated that tolling based on *Weathington* ended thirty days after the case terminated, on September 3, 2015. In other words, that is the date the statute of limitations for Plaintiffs' claims against Graham began to run again. The Sixth Circuit, however, has recently clarified that "once an uncertified class action is dismissed, *American Pipe* tolling ceases, and the class members' individual statute-of-limitations clocks begin running." *Potter*, 9 F.4th at 380. The Court has not identified, and the parties have not cited, any authority that justifies extending the tolling period afforded by the *Weathington* class action beyond the date the case was dismissed. Thus, the Court finds that August 3, 2015 is the date when *American Pipe* tolling for Plaintiffs' claims ceased and the statute of limitations began to run again.

In sum, the statute of limitations for Plaintiffs' claims against Graham that accrued in 2013 ran, at its shortest, from August 8, 2013 to May 9, 2014— a period of roughly 9 months and 1 day—and from August 3, 2015 to November 14, 2017—a period of roughly two years, three months, and 11 days. These two

periods add up to three years and 12 days, placing these claims beyond the three-year statute of limitations.

For these reasons, Plaintiffs' claims against Graham that arose in 2013 are dismissed.

### B. Qualified Immunity

The only claim against Graham remaining is Hearst's claim that arose in January 2014.

Using the same statute-of-limitations analysis, Hearst's last day at the Jail was January 10, 2014. So her claim against Graham would have been tolled from January 10, 2014 to May 9, 2014—a period of roughly four months—and from August 3, 2015 to November 14, 2017—a period of roughly two years, three months, and 11 days. These two periods add up to two years and seven and a half months, placing her Fourth Amendment claim from 2014 within the three-year statute of limitations.

Graham, however, argues that qualified immunity bars Hearst's damages claim from 2014. To overcome the qualified immunity defense, Hearst must prove that (1) Graham's method of conducting strip searches violated the Fourth Amendment and that (2) there is case law that clearly establishes the unconstitutional nature of the strip searches at the time Graham conducted them. *See Gambrel v. Knox Cnty., Kentucky*, — F.4th —, No. 20-6027, 2022 WL 369348, at *3 (6th Cir. Feb. 8, 2022). Both issues are legal questions that this

18

Court can resolve on summary judgment. *Id.* at *4 (citing *Beck v. Hamblen Cnty.*, 969 F.3d 592, 604 (6th Cir. 2020)). But when deciding these two questions, the Court "must view genuine factual disagreements in the light most favorable to the plaintiff." *Id.* As the Sixth Circuit explains, "If a reasonable jury could credit the plaintiff's version of events and if that version clearly shows a [Fourth Amendment violation], we cannot grant the [defendant] summary judgment." *Id.*

### 1. Constitutional Violation

To determine whether a particular search violates the Fourth Amendment, the Court must "balance the nature of the intrusion against the need for the particular search[.]" *Sumpter v. Wayne Cnty.*, 868 F.3d 474, 480 (6th Cir. 2017). Detainees are still afforded some constitutional protections in a carceral setting, though these protections are limited by the "legitimate goals and policies of the penal institution." *Id.* at 481 (citing *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)).

The constitutional issue in Hearst's case is not whether Graham was permitted to conduct a strip search, but whether she conducted the search in a reasonable manner consistent with the Fourth Amendment. This is because Graham worked at registry, so the strip searches she conducted were done to make sure that detainees entering the general population were not bringing in any contraband. *See Florence v. Bd. of Chosen Freeholds of Cnty. of Burlington,*

556 U.S. 318, 339 (2012) (holding that the jail's policy of strip searching all detainees who are committed to the general population is constitutional and officers need not have reasonable suspicion before strip searching new detainees).

Hearst says that Graham's strip searches violated the constitution in a few ways. Specifically, Hearst testified that in January 2014, Graham would purposefully wait until the "bullpen" was full to strip search detainees and would conduct the strip searches in a group setting where detainees could see one another while being searched. (ECF No. 91-6, PageID.2859.) During these searches, Hearst said that Graham would make derogatory remarks about the detainees' bodies and the way they smelled. (*Id.* at PageID.2863, 2866.) According to Hearst, the strip searches were also conducted in an unsanitary environment because Graham told menstruating detainees to remove their tampons or pads, and detainees would often bleed on the floor. (*Id.*)

In response, Graham denies conducting strip searches in this manner. Graham states that in "January 2014, we were searching one at a time[.]" (ECF No. 90-11, PageID.2732.) And she denies making derogatory comments toward any detainee. (*Id.* at PageID.2725.) Graham further testified that she would give detainees a pad so "they would not . . . get a mess on the floor." (*Id.* at PageID.2730.) Graham also submits a number of declarations from other Jail officers and sergeants. (ECF Nos. 91-13–91-19.) All of the declarations deny

that derogatory comments were made during strip searches or that detainees were strip-searched in groups after 2013.[2]

Essentially, what the parties have provided the Court amounts to a factual dispute as to how Graham conducted the strip searches of Hearst. It is not for the Court to resolve such a factual dispute, and at this stage, it must credit Hearst's testimony as the non-moving party. *See Gambrel*, — F. 4th —, 2022 WL 369348, at *7 ("Under the Supreme Court's summary-judgment rules, we must believe the nonmoving party's evidence at this stage and disregard the moving party's conflicting evidence that the jury is not required to believe. When witnesses tell differing stories, therefore, we cannot credit the story of the witness that we find more believable. That is the jury's job." (internal citations omitted)).

---

[2] Plaintiffs argue that the Court should not consider these declarations as Defendants did not disclose the declarants on their witness list. But Defendants included "All current and former employees of Wayne County who have personal knowledge of Plaintiffs' claims, including but not limited to Sheriff's Office personnel who had contact with Plaintiffs" and "All command staff and shift supervisors at the Wayne County Sheriff's Office who have knowledge regarding the conduct of strip searches of female inmates at the Wayne County Jail." (ECF No. 45, PageID.1575.) There is also a catch-all included in the list for all individuals named in documents produced in discovery. (*Id.*) Though the Court does not condone such broad categories of witnesses, Plaintiffs were able to request or move for more specific disclosures from Defendants during discovery. The Court sees no reason to not consider these declarations at this stage.

So the question becomes whether, under Hearst's account of how the searches were conducted, Graham violated Hearst's Fourth Amendment rights.

Given Hearst's description, the answer seems obvious, but to be sure, the Court must evaluate the intrusiveness (by examining the scope, manner, and location of the search) and the penological need for the search, and then balance the intrusiveness against the need. *Sumpter*, 868 F.3d at 482. The Sixth Circuit has held that a strip search was "especially intrusive" in similar circumstances where the plaintiff was exposed to several other detainees during the search and was subject to rude comments by Graham. *Sumpter*, 868 F.3d at 483. Taking Hearst's testimony to be true, as the Court must, it follows that Graham's strip searches of Hearst are similarly intrusive.

Turning to the other side of the scale, which is the penological interest, Graham has not offered any penological interest in support of conducting strip searches *in this manner*. As the Court established above, it does not doubt that Graham had a penological interest in conducting strip searches during registry of detainees. But the question here is not whether the searches should have occurred at all, but whether there is a penological interest in conducting strip searches in a group setting where the officer makes offensive comments toward detainees. There is no evidence in the record providing a justification for strip-searching Hearst in 2014 in a group setting and making derogatory comments

22

toward her. The Court has not been made aware of any time or resource constraints that would justify a strip search in a group. Instead, Graham denies that group strip searches were conducted at the time Hearst was searched. Thus, without any penological interest to weigh against the heightened intrusiveness of the search Hearst testified to, a strip search conducted in this way would violate the Fourth Amendment. *See Stoudemire v. Mich. Dep't of Corrections*, 705 F.3d 560, 574 (6th Cir. 2013) ("Accordingly, although [Defendant] had a valid reason for searching [Plaintiff], no special circumstances provided additional justifications for strip searching [Plaintiff] where others could see her naked."); *Sumpter*, 868 F.3d at 482.

Thus, if a jury were to accept Hearst's testimony as true, it could find that Graham violated the Fourth Amendment when she strip-searched Hearst. So the Court cannot grant summary judgment.

### 2. Clearly Established Law

Turning to the second question of whether the constitutional violation was clearly established, Hearst must show that Graham was on notice from Sixth Circuit or Supreme Court case law that her particular conduct amounts to a constitutional violation. *See Sumpter*, 868 F.3d at 485 ("Qualified immunity protects a constitutional tortfeasor from personal liability unless the contours of the constitutional right [they] violated were sufficiently definite that any reasonable official in the defendant's shoes would have understood

23

that [they] was violating it.") (internal citations omitted); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The Sixth Circuit has noted that "in the Fourth Amendment context," specificity in the case law "is especially important" because "it is difficult for a defendant to know how the legal doctrine will apply to the factual scenario they face." *Sumpter*, 868 F.3d at 485. In other words, the Fourth Amendment inquiry is fact-intensive, so prior case law establishing a violation must present fairly similar facts such that a defendant would be on notice that they are committing a constitutional violation.

The Sixth Circuit has held that "the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest" is clearly established. *Stoudemire v. Michigan Dep't of Corrections*, 705 F.3d 560, 575 (6th Cir. 2013); *see also Sumpter*, 868 F.3d at 487 (referencing "the clearly established right recognized in *Stoudemire*—a public strip search devoid of justification[.]"). Indeed, when analyzing whether a constitutional violation occurred, the *Stoudemire* Court stated, "it is settled that the law demands an adequate need for a strip search, and, depending on the circumstances and context, restricts the scope, manner, and place of the search." *Stoudemire*, 705 F.3d at 574. Specifically, Stoudemire was strip searched in front of unblocked windows where others could see the search, which the Court found added to the already "extreme invasion" of Stoudemire's Fourth Amendment rights. *Id.*

24

at 573. On top of that, Stoudemire stated that the officer "smirked" during the search, which the Court found implicated "the dignitary interest inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches." *Id.* These facts align with Hearst's testimony about how Graham conducted strip searches—in view of other detainees and accompanied by derogatory comments. (ECF No. 91-6, PageID.2859.) And *Stoudemire* was decided a year before the January 2014 searches of Hearst, so it would have provided Graham notice that group strip searches devoid of any penological interest are unconstitutional. *See Stoudemire*, 705 F.3d at 575.

Graham resists this conclusion, resting her argument entirely on the Sixth Circuit's decision in *Sumpter*. There, the Court held that Graham —she was a defendant there too—was entitled to qualified immunity because the constitutional violation in question was not clearly established. *Sumpter*, 868 F.3d at 488 ("[R]egardless of whether Graham, in fact, violated the Fourth Amendment, no reasonable officer would have known that at the time. We therefore hold, as the district court did, that defendant Graham is entitled to qualified immunity."). And so, says Graham, because the claim in *Sumpter* is identical to the claim Hearst brings here, this Court should also find that the violation was not clearly established at the time it was allegedly committed.

In making this argument, however, Graham ignores an important distinction the Sixth Circuit made when determining that *Stoudemire* did not

clearly establish the violation alleged by Sumpter. Specifically, the Court in *Sumpter* stated that in *Stoudemire* "there was *no* penological justification for the particular searches at issue. This critical difference makes *Stoudemire* . . . [a] poor template[] for declaring the particularized right at issue in this case— freedom from a group strip search *supported* by a legitimate penological justification—clearly established." *Sumpter*, 868 F.3d at 468.

In contrast, as the Court explained previously, Graham does not offer any penological justification for conducting a group strip search of Hearst in January 2014 or making derogatory comments toward her. Instead, Graham denies that these allegations are true. (*See* ECF No. 90-11, PageID.2725 (answering "no" to whether she believed she made any derogatory comments toward individual during registry); *id.* at PageID.2732 ("January 2014 we were searching one at a time.").) So the conclusion in *Sumpter* that the violation is not clearly established, which is based on the fact that there was an uncontradicted penological interest in support of the group strip searches, is not relevant here where there is not a countervailing interest in the record. Hearst also testifies that Graham intentionally waited for the "bullpen" to get full instead of conducting the searches one-by-one. (ECF No. 91-6, PageID.2859.) And since the Court is required to credit Hearst's testimony at the summary-judgment stage, it is left to answer whether it is a clearly established violation of the Fourth Amendment to be strip searched in a group

of other detainees and subject to derogatory comments during those searches with *no* counterweighing penological interest. *Cf. Sumpter*, 868 F.3d at 468 (addressing "a group strip search *supported* by a legitimate penological justification"). *Stoudemire* tells us that the answer to that question is yes.

Therefore, the Court finds that Hearst has met her burden at summary judgment of showing that the constitutional violation was clearly established under Sixth Circuit case law at the time it allegedly occurred. At this stage, qualified immunity does not shield Graham from liability for Hearst's claim from 2014.

# IV.

Having addressed the claims against Graham, the Court will now turn to the *Monell* claims against Wayne County and former Wayne County Sheriff Benny Napoleon.

## A. Individual Violation

The Court first considers whether Plaintiffs may pursue their *Monell* claims based on searches in 2013 even though those claims against Graham have been dismissed. This is not entirely clear under governing law.

In *Watkins v. City of Battle Creek*, the Sixth Circuit held that if "no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." 273 F.3d 682, 687 (6th Cir. 2001). The reasoning behind this broad rule is that to proceed with a

§ 1983 claim, a plaintiff must show a deprivation of a constitutional or federal right caused by a person acting under the color of state law. *See Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 736 (6th Cir. 2015). Generally, if no constitutional violation can be attributed to an individual municipal actor, it is unlikely that the plaintiff was deprived of a constitutional right at all. *See North*, 754 F. App'x at 390.

But more recently, the Sixth Circuit has recognized that "in certain unusual circumstances, a municipality might be liable for a constitutional violation even in the absence of a liable individual." *Hart v. Hillsdale Cnty., Michigan*, 973 F.3d 627, 645 (6th Cir. 2020). The Sixth Circuit has not yet decided whether an individual defendant must be liable before municipal liability can be found. *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018) ("But we need not decide whether, under our court's precedent, a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation."). In *Brawner v. Scott Cnty., Tennessee*, however, the Sixth Circuit proceeded with its analysis of whether a jail nurse violated Brawner's constitutional rights, even though no individual officer remained as a defendant in the suit per a stipulation by the parties. 14 F.4th 585, 597 (6th Cir. 2021). The Court noted that the Sixth Circuit has "not always been consistent in discussing" whether a *Monell* claim "depends on [plaintiff]

showing that a county actor violated [plaintiff's] constitutional rights," but it made no difference there because "Brawner presented evidence from which a reasonable jury could find that [the jail nurse] violated Brawner's constitutional rights, and that this violation was the result of the County's policies." *Id.* The same thing could be said about Plaintiffs' claims against the County.

Like *Brawner*, the Court must first determine whether the plaintiffs presented evidence from which a jury could find that Graham violated their constitutional rights before it can consider if that violation was the result of the County's policies under *Monell*. At the first step, that Court concludes that they have presented sufficient evidence of a constitutional violation.

To reiterate, when determining whether a particular search amounts to a violation of the Fourth Amendment, the Court must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted while also examining obvious, easy alternatives that accommodate the [detainees] privacy interests at little cost to valid penological objectives." *Salem v. Mich. Dep't of Corrections*, 643 F. App'x 526, 530 (6th Cir. 2016). All plaintiffs testified that they were strip-searched in front of other women detainees, and sometimes in front of men, during the registry process and in the housing unit while being subjected to derogatory comments about their bodies. They also state that Graham and

other Jail officers working at registry intentionally waited until the bullpen was full to strip search detainees. As discussed earlier, absent a penological interest in conducting searches in this way, these strip searches would constitute violations of the Fourth Amendment. *See Stoudemire*, 705 F.3d at 574.

So "[t]he question, then, is whether any exigent circumstances compelled [the officer] to strip search [Plaintiffs] in view of other inmates and prison personnel." *Id.* at 573–74.

As an initial matter, the Court notes that the analysis here varies slightly from the above analysis for Hearst's claim against Graham that accrued in 2014. *See supra* Part III.B. This is because Plaintiffs' 2013 strip searches took place before the Jail's policy on strip searches changed. So Graham did not testify that these group searches alleged by Plaintiffs did not take place (though she does dispute that any men were able to see women being strip searched (ECF No. 90-11, PageID.2720, 2723 (saying male officers or trustees were "not ever" in the change-out room or in the registry area when detainees were strip searched).)) To the contrary, Graham admitted that before the policy changed, she would strip search detainees at registry in groups of up to five. (*Id.* at PageID.2714.) She testified that she did not pick the group of five based on any criteria, and that she would not always search five at a time— it could vary from one to five at a time. (*Id.*) So to some extent, Graham does

dispute the number of detainees that were strip searched at one time. (*See* ECF No. 89-6, PageID.2396 (Woodall stating she was searched in a group of eight to ten).) But, at bottom, she does not dispute that Plaintiffs were group strip searched with up to five detainees before November 2013.

In terms of why Graham had to strip search detainees in a group, she testified that it would "depend on how many people we got" and what was going on at the time. (ECF No. 91-11, PageID.2714.) She also testified that the number of people to be processed into the Jail would depend on the time of day and other events, such as how many "court returns" the Jail has had or whether "central transfer" brought in more people. (*Id.* at PageID.2705.) And she testified that the purpose of the strip searches in general is to make sure no contraband makes it into the Jail. (*Id.* at PageID.2715–2716, 2737.) The declarations from others who work at the registry support Graham's testimony. They state that in 2013, strip searches of up to five women were conducted "when volume required it." (*See, e.g.*, ECF No. 89-12, PageID.2493 (Decl. of Corporal Kimberly Baker); *id.* at PageID.2503 (Decl. of Sergeant Michael Hill); *id.* at PageID.2509 (Decl. of Captain Karmen Ramirez).)

This evidence is not enough to show that there is no dispute of fact over whether a "legitimate penological interest" justified strip-searching plaintiffs in a group. *See Sumpter*, 868 F.3d at 484. Defendants offer no details as to why group strip-searches were necessary beyond volume constraints, let alone

31

evidence specific to when the plaintiffs were strip searched. For instance, Defendants have not produced evidence of the number of detainees who had to be searched in the summer of 2013 or the average number of detainees processed per shift. There is no evidence on what circumstances necessitate a group search versus when a group search would not be necessary. Graham did testify that it could take up to 10 minutes to conduct a strip search, but without knowing the other numbers, the Court has no way of saying, as a matter of law, that one-on-one strip searches were not feasible. (ECF No. 90-11, PageID.2737.) And though Defendants may have a reason justifying efficiency over privacy with these searches—such as allowing detainees to receive medical treatment as soon as possible—they have not provided evidence of this to the Court. *Cf. Sumpter*, 868 F.3d at 484 (discussing Graham's extensive testimony on why the need for prompt medical attention justifies group strip searches).

Moreover, the Court must accept Plaintiffs' account of the facts. And Defendants penological justifications, to the extent they are established, are contested by Plaintiffs' testimony that, when they were being searched, Graham and other officers intentionally waited for the cell to get full before conducting strip-searches.

In all, a reasonable jury could credit Plaintiffs' observations and determine that at least some of the time, even when no penological justification

for a group strip search existed, registry officers would routinely conduct group strip searches instead of conducting individual searches "when possible." And at the very least, there is not enough evidence on the record for this Court to state that the penological interest outweighs the intrusiveness of the search as a matter of law.

The Court recognizes that this case presents narrow circumstances that allow Plaintiffs' *Monell* claims based on searches in 2013 to proceed despite their claims against Graham being dismissed. This is primarily because the claims were dismissed as untimely and not on the merits. And perhaps because of how *American Pipe* tolling applies in this case, the County has not raised a statute-of-limitations defense. If it applied differently, perhaps the claims against Graham and the claims against the County would rise and fall together in light of the statute of limitations. And Plaintiffs presented sufficient evidence to raise a dispute of fact as to whether Graham violated their constitutional rights such that there may be a constitutional violation that the County can be held responsible for under § 1983 even though no individual is liable. These conditions provide a basis for the Court to consider these plaintiffs' *Monell* claim. But these same conditions will not be present in every case, or even many cases.

So based on these limited circumstances, the Court may proceed to consider Plaintiffs' *Monell* claims based on searches in 2013.

33

## B. *Monell* claims from 2013

Turning to the merits of the *Monell* claims, the Court will begin by analyzing all four plaintiffs' claims from 2013 first, and then turn to Hearst's remaining claim from her incarceration in January 2014. This is because there is a major factual difference in the circumstances of the strip-searches that occurred in 2013 from those that occurred in 2014: the County changed its Jail strip-search policy in November 2013, mandating that all female detainees be strip searched one at a time. (ECF No. 102-2, PageID.3341.) Since this significantly alters the deliberate-indifference element that is required for Plaintiffs' *Monell* theories, the Court will analyze the 2013 claims separately from the 2014 claims.

An explanation of the legal principles behind *Monell* liability is useful before the Court proceeds with its analysis. Local governments cannot be sued under § 1983 based solely on injuries inflicted by their employees or agents. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Plaintiffs can make this showing in four ways: "(1) the municipality's legislative enactments or official policies; (2)

actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Winkler v. Madison Cnty.*, 893 F.3d 877, 901 (6th Cir. 2018).

Plaintiffs state that their *Monell* claims fall into three of the above categories: actions taken by officials with final decision-making authority, the County's custom of tolerance or acquiescence of federal violations, and the County's policy of inadequate training or supervision. The Court will address each theory in turn.

### 1. Actions of Policymaking Officials

Plaintiffs state that Wayne County is liable under *Monell* based on the "active participation of its supervisory personnel in the unconstitutional strip searches." (ECF No. 102, PageID.3336.) In support of this claim, Hearst testified that there was a male sergeant in view of her getting strip searched during a "shakedown" search of the Jail's housing unit (ECF No. 91-6, PageID.2858), and Davis testified that a male sergeant would enter the housing unit while women detainees were taking showers. (ECF No.90-6, PageID.2643).

There are a few issues with this claim. First, Plaintiffs do not provide evidence showing that sergeants have final "decision-making authority" such that their constitutional violations can make the County liable under *Monell*.

35

*See Bd. of Cnty. Comm'rs. of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405
(1997); *Wallace v. Coffee Cnty., Tennessee*, 852 F. App'x 871, 877 (6th Cir. 2021)
("As a preliminary matter, it is not clear to us that Rick Gentry is actually an
official with final decision-making authority. Gentry is not the official
ultimately responsible for the Coffee County Jail; that is the county sheriff.");
*see also* Mich. Comp. Laws § 51.75 ("The sheriff shall have the charge and
custody of the jails of his county, and of the prisoners in the same[.]"). Plaintiffs
do not identify which sergeants participated, whether they typically have
authority or discretion over such decisions, or whether they have final decision-
making authority over the manner in which strip searches are conducted at
the Jail in general. And if Plaintiffs' theory is that the sergeants themselves
have final decision-making authority, then it is unclear what their claim
against Sheriff Napoleon is.

Alternatively, if Plaintiffs are instead asserting a *Monell* claim based on
Sheriff Napoleon's supervisory liability, it fails because they have not shown
that Sheriff Napoleon "actively engaged in unconstitutional behavior." *See
Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *Leach v. Shelby
Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989) ("The law is clear that
liability of supervisory personnel must be based on more than merely the right
to control employees. Further, a claim of failure to supervise or properly train
under section 1983 cannot be based on simple negligence."). Plaintiffs have not

36

testified that Sheriff Napoleon engaged in unconstitutional strip searches himself. *See id.* And in their summary-judgment response, Plaintiffs points to no evidence specific to Sheriff Napoleon that would show he encouraged, authorized, or knowingly acquiesced in the alleged actions of jail personnel. So they cannot pursue a claim that Sheriff Napoleon failed to supervise sergeants under his control, leading to Plaintiffs being strip searched in front of or in view of male officers.

Thus, Plaintiffs may not proceed with a *Monell* claim based on the actions of officials with decision-making authority.

### 2. Custom of Tolerance or Acquiescence

To prevail on a theory that the County had a custom of tolerance or acquiescence to federal violations, Plaintiffs must show, "(1) the existence of a clear and persistent pattern of violating federal rights . . .; (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the 'moving force,' or direct causal link for the constitutional deprivation." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)). The County contests whether Plaintiffs can show the

existence of a clear pattern of federal violations and whether the County had actual or constructive notice of these violations.

There is ample evidence of a clear pattern of federal violations. Plaintiffs have submitted numerous declarations from detainees at the Jail prior to June 2013 stating they were subject to strip searches in view of other women and male Jail personnel where they were called derogatory names and subject to unsanitary conditions. (*See, e.g.*, ECF No. 18-2, PageID.490 (Decl. of Audrey Aikens who was incarcerated in 2010); *id.* at PageID.505 (Decl. of Stacey Anderson who was incarcerated in 2010); *id.* at PageID.513 (Decl. of Regina Austin who was incarcerated in July 2012).) These are just three examples out of many provided to the Court.

Defendants argue that the use of these declarations at summary-judgment is improper because such evidence would not be admissible at trial. Specifically, Defendants first argue that allowing evidence of other incidents would allow the trial to devolve into "mini trials" over whether the other witnesses experienced unconstitutional strip searches. The Court has not identified a Sixth Circuit case prohibiting the admission of other alleged constitutional violations when trying a *Monell* claim because it would result in "mini trials." And it is not clear how else Hearst would prove a *Monell* claim that requires a showing of a pattern or practice without presenting evidence of

other constitutional violations, even if Defendants contest that these prior violations occurred.

Second, Defendants argue that admission of these prior instances would be prohibited by Federal Rule of Evidence 404(b), which prohibits evidence of another crime, wrong, or act to prove action in conformity therewith. But Rule 404(b)(2) provides several reasons why such evidence would be proper to submit to a jury, which include motive, opportunity, intent, knowledge, absence of mistake, or lack of accident. The evidence of other group strip searches goes toward showing the absence of mistake and lack of accident, i.e., that the County deliberately ignored such a pattern and allowed the violations to continue. In fact, deliberate indifference "does not mean a collection of sloppy, or even reckless oversights; it means evidence showing an obvious deliberate indifference to the alleged violation." *Thomas*, 398 F.3d at 433. So beyond being evidence that goes to the central issue—whether there is *Monell* liability based on a pattern or practice of constitutional violations—Hearst may also use evidence of such a pattern to show that the County was not merely negligent but deliberate in its failure to act.

Third, Defendants argue that the use of such declarations is prohibited by Federal Rule of Civil Procedure 37 because Plaintiffs did not disclose the declarants as witnesses in discovery. But the Court finds that Plaintiffs' witness list names the authors for the declarations identified above, as well as

over five hundred other witnesses, so Defendants had adequate notice to depose or subpoena them if they wished. (*See* ECF No. 43.)

Therefore, Plaintiffs have met their summary-judgment burden of creating a genuine dispute of fact over whether there exists a clear or persistent pattern of violations.

The Court also finds that there is a genuine dispute of material fact as to whether the County had notice strip searches were being conducted in this manner in the summer of 2013. As Plaintiffs point out, the *Weathington* suit commenced in September 2012 against the County, so the County was at least aware of the four instances of unlawful strip searches alleged in that complaint. *See* Complaint, *Weathington*, Case No. 5:12-cv-13573, ECF No. 1. And Woodall, Johnston, and Davis all testified that they reported the strip searches to Jail personnel near the time they occurred. (ECF No. 92-4, PageID.3068 (Johnston stating, "I talked to officers. I asked to speak to shift command. I was denied shift command. I was actually told that they would speak with them and let me know and get back to me in a few hours, or whatever. No one ever came to talk to me."); ECF No. 89-6, PageID.2384 (Woodall stating she complained "every time" to officers about the group strip searches); ECF No. 90-6, PageID.2640 (Davis stating she wrote a "kite" complaining about the searches).) True, Defendants provide declarations from Jail personnel stating they are not aware of any complaints about the strip

searches and that they would investigate such complaints seriously. (*See, e.g.*, ECF No. 92-12, PageID.3170 (Decl. of Sergeant Denie Marks).) But again, this creates a fact dispute that the Court cannot resolve at summary-judgment.

Thus, because a reasonable jury could decide that there was a pattern of constitutional rights violations preceding Plaintiffs' 2013 claims and that the County had notice of these violations, Plaintiffs may proceed with their 2013 *Monell* claims against the County based on a custom of acquiescence.

### 3. Failure to train

Similarly, Plaintiffs may proceed with their 2013 *Monell* claims on a theory of failure-to-train.

To show that the County is liable under *Monell* based on a failure-to-train claim, Plaintiffs "must establish that: 1) the [County's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [County's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019).

The evidence on the County's training program for strip searches is slim. Graham testified that she never took a class, but when she started working at the registry, the officer there "showed me how it is done." (ECF No. 90-11, PageID.2720.) The Court also notes that other than Graham's testimony, there is no other evidence in the record of inadequate training. *See City of Canton,*

*Ohio v.* Harris, 489 U.S. 378, 390–91 (1989) ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program.").

Nevertheless, the Court finds that a reasonable jury could find that the County's training program as it stood in the summer of 2013 was inadequate for the strip searches officers must perform. In 2013, Graham was one of two officers who worked the registry, so it is likely that she conducted at least half, if not more, of the strip searches. (*See* ECF No. 90-11, PageID.2709.) So even though the only evidence is about Graham's training, that evidence is still probative of a general lack of training. Further, at this point, the County's policy was to conduct individual strip searches "when possible." (ECF No. 102-3, PageID.3345.) And there is no evidence that Graham or other registry officers were trained on the meaning of this amorphous phrase or given guidance on how to manage different circumstances so it would be "possible" to conduct individual strip searches. For example, there could have been a training program that was designed to guide officers in delegating tasks or prioritizing tasks or searches in a way that avoided group strip searches unless necessary. *See Shadrick v. Hopkins Cnty., Kentucky*, 805 F.3d 724, 740 (6th Cir. 2015) ("While the nurses may have received some limited on-the-job training when beginning their employment . . . there is no proof of a training

program that was designed to guide LPN nurses in [certain medical tasks] in order to avoid constitutional violations."). There is no evidence that Graham or other officers even knew what made a penological interest "legitimate" or not, which is a central inquiry in the constitutionality of a group strip search. The evidence of lack of training on this policy coupled with the evidence of a pattern of constitutional violations detailed in the section prior would permit a reasonable jury to find that the County was deliberately indifferent to the need to better train its officers. *See Shadrick*, 805 F.3d at 741.

Thus, Plaintiffs may also proceed with a failure-to-train *Monell* claim against the County for the 2013 constitutional violations.

### C. *Monell* claim from 2014

The only thing left for the Court to consider is Hearst's *Monell* claim against the County based on searches in 2014. As a reminder, Hearst was incarcerated at the Jail from January 7, 2014 to January 10, 2014, so any constitutional injuries she suffered must have taken place within those dates.

### 1. Actions Taken by County Officials

For the reasons discussed previously in Part IV.B.1, Hearst's *Monell* claim based on the actions taken by County officials is not viable.

## 2.Custom of Tolerance or Acquiescence

Hearst also claims that the County had a "custom of tolerance or acquiescence" of Fourth Amendment violations, which led to her being unconstitutionally searched in January 2014.

To pursue such a claim, Hearst must show the County's "tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction[.]" *See Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). In other words, a municipal custom "may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Lipman v. Budish*, 974 F.3d 726, 748 (6th Cir. 2020); *see D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) ("The county cannot have tacitly approved an unconstitutional policy of which it was unaware.").

But Hearst runs into an issue here. Wayne County changed its strip search policy on November 22, 2013, requiring that all strip searches of female detainees be conducted one at a time from then on. (ECF No. 102-2, PageID.3341.) So the County seemingly acted in response to the alleged prior constitutional violations and changed its policy to be clearly constitutional in terms of who was allowed to see detainees strip searched. And for purposes of this specific analysis, the constitutional violations Hearst allegedly suffered occurred in early January 2014. The deliberate indifference inquiry, therefore,

44

is narrower than merely showing that the County was deliberately indifferent "in failing to act" in response to constitutional violations from before January 2014. Because of the intervening policy change where the County did act, Hearst must show that in January 2014, the County, despite changing the policy in November 2013, knew or should have known that its officers continued to conduct group strip searches and did nothing more about it. In other words, "the evidence must show that the need to act is so obvious that the *conscious* decision not to act amounts to a policy of deliberate indifference toward the Plaintiffs' constitutional rights." *Alsaada v. City of Columbus*, 536 F.Supp.3d 216, 272 (S.D. Ohio 2021) (emphasis added) (quoting *Doe v. Claiborne Cnty., Tenn. By and Through Claiborne Cnty. Bd. of Edu.*, 103 F.3d 495, 508 (6th Cir. 1996)). Such a "conscious" decision could only occur if the County knew or should have known that its officers would violate its new policy, and by failing to address this before January 2014, Hearst's rights were violated.

The Court first looks to whether there was a pattern of violations that could have put the County on notice that its new policy was not being followed. The Court has identified four other individuals that were subject to group strip searches that Hearst could potentially use to show a clear and persistent pattern. (*See* ECF No. 18-3, PageID.762 (Decl. of Tonnie Johnston stating she was in the Jail from November 14, 2012 to March 21, 2014); *id.* at PageID.836

(Decl. of Chanel McDonald states she was in the Jail from November 10, 2012 to February 26, 2014, and specifically, that she was group strip searched on November 22, 2013); ECF No. 18-4, PageID.975 (Decl. of Rickira Smith stating she was in the Jail from November 2013 to April 2014); *id.* at PageID.1023 (Decl. of Tiffani Turner stating she was in the Jail on January 7, 2014).)[3] True, searches of four detainees other than Hearst is not the most robust evidence of a pattern, especially considering only one of the declarants gave specific dates of searches. But a reasonable jury could find that each of these five detainees were strip searched multiple times during their detention, as some of the declarations state that they were subject to strip searches multiple times both at registry and in the housing unit at random times. (*See* ECF No. 18-3, PageID.762, 836.) If a jury were to credit these witnesses and find they were searched in groups on more than one occasion, it might be reasonable to infer that there was a pattern of group strip searches that continued after the

---

[3] There were two other witnesses that may have experienced group strip searches that fell within the relevant period. (*See* ECF No. 18-5, PageID.1130 (Letter from Miah Stroud stating she was in the Jail from December 11, 2013 to January 7, 2014); *id.* at PageID.1133 (Letter from Sabrina Wakefield stating she was in the Jail from November 8, 2013 to April 14, 2014).) But the Court will not consider them at summary judgment as the evidence comes in the form of unsworn letters, which are inadmissible at trial. *See M.J. by and through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F. 4th 436, 446–47 (6th Cir. 2021) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. And hearsay—an out-of-court statement offered for its truth—is inadmissible unless the Federal Rules of Evidence or a federal statute provides otherwise. Thus, at summary judgment, hearsay must be disregarded." (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997))).

County changed its policy. *Cf. Thomas v. City of Chattanooga*, 398 F.3d 426, 434 (6th Cir. 2005) (holding that there was no genuine issue of whether an illicit policy existed because plaintiff failed to show "several separate instances of the alleged rights violation."); *see also Leach*, 891 F.2d at 1248 (finding that 14 other instances of violations amounted to a policy of deliberate indifference).

But even if Hearst has enough evidence to establish a pattern, her evidence that the County knew or should have known about the pattern and made a "conscious" decision to ignore it is weak. The declarations identified above as part of the alleged pattern of violations do not state that these incidents were reported when they happened or at any time to the Jail directly. So Hearst must provide some other evidence that the County knew or should have known that, even after it changed its policy, group strip searches were still occurring.

Hearst, however, fails to point to any evidence that the County knew about the continued violation of its policy before Hearst was strip-searched in 2014. Hearst cites the following events as evidence that the County had notice that its policy change was not enough to stop the violations:

- August 2012—*Weathington* complaint is filed
- July 2013—Janine Weathington is deposed
- October 2013—*Weathington* class certification motion is filed with 125 declarations attached
- November 26, 2013—more declarations are filed in *Weathington*
- April 4, 2014—more declarations are filed in *Weathington*
- December 2014—*Sumpter* class action was filed with 300 declarations

47

The evidence from before November 22, 2013 is not relevant to whether the County had notice of continuing violations after its policy change. And the evidence from April and December 2014 is too delayed to support Hearst's claim. Because Hearst has to show that the County's failure to act in response to the pattern of violations caused Hearst to be subject to an unconstitutional strip search, both the pattern of violations and notice have to occur before Hearst's last strip search—which occurred at the latest on January 10, 2014. Notice given in the form of affidavits submitted in April or December 2014 could not have allowed the County to be deliberately indifferent to Hearst's unconstitutional strip search in January 2014.

So the only evidence Hearst points to that the County knew about the violations is the declarations that were filed in *Weathington* on November 26, 2013. This date is so soon after the new policy was enacted that, at best, it would have shown four days of violations in the relevant period. But even more concretely, the Court has identified only three declarations alleging possible unconstitutional strip searches during this narrow four-day window. And again, three out of four of the relevant declarations fail to identify the exact date of the strip searches. (*See* ECF No. 18-3, PageID.762 (Decl. of Tonnie Johnston stating she was in the Jail from November 14, 2012 to March 21, 2014); *id.* at PageID.836 (Decl. of Chanel McDonald states she was in the Jail

from November 10, 2012 to February 26, 2014, and that she was group strip searched on November 22, 2013); ECF No. 18-4, PageID.975 (Decl. of Rickira Smith stating she was in the Jail from November 2013 to April 2014).) And none of them could have been submitted in the *Weathington* litigation in November 2013 because they were signed after November 26, 2013.

Without any evidence showing that County knew about the violations such that it could make a conscious decision to ignore violations of its policy, the only way Hearst can prevail is by showing that the County should have been on notice based on a pattern of "enough similar incidents." *See Leach*, 891 F.2d at 1247. That is not the case here, however. The County changed its policy in November 2013, and thus the "need to act" was not "so obvious" without any indication that the group strip searches were ongoing. *See Alsaada*, 536 F.Supp.3d at 272. And even if the Court were to infer that the three declarations were enough to put the County on notice of the pattern of rights violations, there is not enough evidence to go one step further and find that the County *consciously* decided not to act based on what it knew at the relevant time. Instead, it was reasonable for the County to think the issue had been resolved as it had directed its officers to only strip search female detainees one at a time. The Court finds no evidence showing "that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures" causing Hearst to be unconstitutionally searched on

49

January 10, 2014. *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005).

So Hearst may not proceed on her *Monell* claim based on a pattern of acquiesce or tolerance of federal violations.

### 3. Failure to Train

The last leg of Hearst's *Monell* claim against Wayne County is her argument that Wayne County failed to properly train Graham.

As a reminder, to show that the County is liable under *Monell* based on a failure-to-train claim, Hearst "must establish that: 1) the [County's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [County's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019).

The County's policy change in November 2013 mandates a different outcome for Hearst's failure-to-train claim for searches in 2014 versus the failure-to-train claims for searches in 2013. Hearst states that she was subject to strip searches in front of other detainees and while Graham made derogatory comments to her. She also states that at one time during a "shakedown," a male sergeant could see into the area where she was strip-searched. But the County's policy instructs its officers to not do any of those things. So it is not clear what additional training the County could have given

Graham specifically or any of the other officers to prevent these violations from occurring. *See Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 584 (6th Cir. 2020) ("Griffith has introduced no evidence of any additional training that would have been necessary[.]"); *Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018) ("But [the plaintiff] does not identify what other medical training she believes that the jail personnel should have received."). Based on her deposition, Graham is aware of the new County policy and the way the County mandates strip searches be conducted—out of view from those of the opposite gender, individually, and without derogatory comments. (*See* ECF No. 90-11, PageID.2725.) Hearst has not identified other training Graham should have received to prevent Hearst from being searched in a group beyond showing Graham a policy that said not to conduct strip searches in groups. The same goes for making derogatory comments. Graham conceded that the comments allegedly made were derogatory but denies making them. (*See* ECF No. 90-11, PageID.2725 ("Derogatory is derogatory. Anything that would hurt somebody's feelings"); *id.* at PageID.2728 ("They would be derogatory, but I didn't say it.").) So Graham knew what would be considered derogatory. Beyond telling Graham that she is not to make derogatory comments, it is unclear what more the County needs to do to provide adequate training on this issue.

In 2014, the County no longer put Graham in a situation where she had discretion to choose how to act, leaving detainees exposed to an unconstitutional choice. It instead mandated how these searches were to be conducted, leaving no room for unconstitutional actions unless the County was ignored. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989) ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.").

But even if the Court were to ignore the dearth of evidence in support of inadequate training, Hearst cannot meet the deliberate-indifference element for her failure-to-train claim. *See Gambrel v. Knox Cnty., Kentucky*, — F.4th — , No. 20-6027, 2022 WL 369348, at *12 (6th Cir. Feb. 8, 2022) ("The deliberate-indifference and causation elements regularly foreclose failure-to-train claims against municipalities when rogue employees engage in blatant wrongdoing[.]"). To show that the inadequate training was the result of deliberate indifference, Hearst must show either "prior instances of unconstitutional conduct demonstrating that the County . . .was clearly on notice that the training in this particular area was deficient and likely to cause

52

injury," or "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation[.]" *See Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 583 (6th Cir. 2020).

Hearst claims that there is a widespread pattern of similar conduct. But as explained earlier, from November 22, 2013 to January 10, 2014, the last date Hearst could have been strip-searched at the Jail, the Court has identified four individuals that *may* have suffered the same violation. It is not clear whether these four violations is enough to put the County on notice that its training program was deficient even after its blanket ban on group strip searches, or whether the County was aware of these violations before Hearst was strip-searched. *See Osberry v. Slusher*, 750 F. App'x 385, 397 (6th Cir. 2018) (noting that a county's knowledge of three prior instances could not establish notice in support of a failure to train claim). These declarations were included in hundreds of pages of similar declarations submitted in litigation and were presumably not read the same day, or even week or month, that they were received.

The County also provided the new policy to Jail personnel, who seem to understand that strip searches are no longer to be conducted in groups. (*See, e.g.*, Decl. of Corporal Kimberly Baker, ECF No. 91-13, PageID.2960 ("After the issuance of the directive in late 2013, every female inmate was searched

individually with no exceptions."); Decl. of Captain Karmen Ramirez, ECF No. 91-16, PageID.2976 ("After the issuance of the directive, I am not aware of a single instance where a female inmate was not strip searched individually.").) Thus, the uncontradicted evidence shows that the County told its officers to conduct strip searches individually and that the employees at least knew of the policy (though it is obviously contested whether that policy was followed). Having just told its employees to conduct strip searches consistent with the Constitution, the group strip searches Hearst says she experienced were not the "known or obvious consequence" of lack of training or supervision. *See Gambrel*, 2022 WL 369348, at *10. Instead, if they happened, they were the result of municipal employees disregarding a known County directive. And there is no evidence that the County was aware that the group strip searches continued despite its directive otherwise.

The Court finds no basis to hold that the County was deliberately indifferent to the need to train its employees, leading to the violation of Hearst's constitutional rights. Instead, the County responded by creating a ban on group strip searches, taking it out of the employees' discretion, and advised them of the new rule. If group strips searches continued, then it was despite the County's actions—not because it was deliberately indifferent. The County therefore cannot be held liable under *Monell* for failure-to-train when the violations that occurred were not a "known or obvious consequence" of the lack

54

of training or supervision. *See Gambrel*, 2022 WL 369348, at *10. Hearst's failure-to-train theory does support a *Monell* claim.

In sum, Hearst has not shown a genuine dispute of fact allowing her to submit her *Monell* claim for searches in 2014 to a jury, so that claim is dismissed.

## V.

For these reasons, Defendants' motions for summary judgment (ECF Nos. 89, 90, 91, 92) are GRANTED IN PART and DENIED IN PART. Plaintiffs' claims against Graham for searches in 2013 are dismissed. But Hearst's claim against Graham for searches in January 2014 survives. All four plaintiffs' *Monell* claims against Wayne County for injuries in 2013 survive, but only on custom-of-acquiescence or failure-to-train theories. Hearst's *Monell* claim for injuries sustained in 2014 is dismissed. And Sheriff Napoleon is dismissed.

SO ORDERED.

Dated: March 10, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE